Barbara DAVIS, Appellant,

v.

Joseph A. CALIFANO et al.

No. 78–1398.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 26, 1979.

Decided Nov. 8, 1979.

As Amended Feb. 14, 1980.

Gwendolyn Jo M. Carlberg, Alexandria, Va., for appellant.

Paula J. Page, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Peter E. George, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before WRIGHT, Chief Judge, and MacKINNON, Circuit Judge, and AUBREY

E. ROBINSON, Jr.*, United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by District Judge AUBREY E. ROBINSON, Jr.

Dissenting opinion filed by Circuit Judge MacKINNON.

AUBREY E. ROBINSON, Jr., District Judge:

Appellant, Dr. Barbara Davis, is a white female employee at the National Heart, Lung and Blood Institute (NHLBI), National Institutes of Health (NIH), of the United States Department of Health, Education and Welfare (HEW). She alleged unlawful discrimination against her based on her sex, in hiring, promotions, and other conditions of employment, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Opportunity Act of 1972, 42 U.S.C. § 2000e, *et seq.*[1] Appellant's Complaint sought damages, back pay, overtime pay, promotion to a GS–13 level position, declaratory, injunctive, and other relief. Following a trial *de novo*,[2] the district court dismissed Appellant's Complaint and entered judgment for Appellee pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FACTS

Appellant received a Bachelor of Science Degree in 1968 prior to beginning work at NIH.[3] She was hired as a GS–5 chemist in March, 1968.[4] Shortly thereafter, Appellant was transferred to the intramural research division of NHLBI.[5] Although most of the GS–5 chemists at NHLBI intramural

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The trial court in its first Conclusion of Law, properly dismissed Appellant's Fifth Amendment due process claims, holding that her exclusive remedy was provided by Title VII of the Civil Rights Act of 1964. *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Richardson v. Wiley,* 186 U.S.App.D.C. 309, 569 F.2d 140 (D.C. Cir. 1977). Moreover, the court below properly dismissed this action as to the individual federal defendants. Secretary Califano is the only appropriate defendant

herein, as he is the head of the agency. 42 U.S.C. § 2000e–16(c).

2. Trial was held November 28, 1977, through December 12, 1977.

3. Trial Transcript, November 30, 1977, at 247.

4. Trial Transcript, November 30, 1977, at 247.

5. Trial Transcript, November 30, 1977, at 246–47, 254–55.

research were promoted to a GS–7 after one year of service,[6] Appellant was not promoted to the GS–7 level until June, 1970.[7] The district court found that the delay in Dr. Davis' promotion was due to an administrative oversight, and that, when the oversight was noticed, Appellant was promoted and an effort was made to recompense her by paying all of her tuition and purchasing many of her books for her work on her Master's Degree.[8]

Appellant received her Master's Degree in early 1973,[9] and a Ph.D. in chemistry in February, 1977.[10] Appellant was promoted to GS–9 level in November, 1975, and remains a GS–9 today.[11] Several male chemists were promoted to GS–9 level with less time in grade than Appellant.[12] Dr. Davis is in the 13–20 Series for Chemists.[13] The district court found that this series had a normal career ladder from a GS–5 through a GS–9 level.[14] Positions above the GS–9 level were filled by the Senior Scientific Research Staff.

Generally, promotions from GS–7 to GS–9 were initiated by individual supervisors. Their recommendations would be reviewed by the branch chief, and, if approved, would then be submitted to an independent promotion panel. This procedure was designed to advance a process of grade de-escalation then underway. No criteria existed to guide supervisors, branch chiefs, or promotion panels in determining whether a promotion was justified. Nor were there criteria specified for selection of promotion panels. Rather, promotion panels were composed on an *ad hoc* basis of professional scientific staff members.[15] As will be discussed later, the professional scientific staff was predominantly male.[16]

The qualifications for a senior scientific research staff position of independent investigator, the position sought by Dr. Davis, are the capability of perceiving a specific research problem and developing a hypothesis and protocol for determining its truth or falsity.[17] An independent investigator posi-

---

6. Trial Transcript, December 1, 1977, at 447.

7. Trial Transcript, November 30, 1977, at 260, 275–76. Most of the chemists at NHLBI intramural research were women. Trial Transcript, December 1, 1977, at 447.

8. Findings of Fact Nos. 12, 16. It was NHLBI's normal policy that only one course per semester be supported, and that no books be purchased. Trial Transcript, December 7, 1977, at 855.

9. Trial Transcript, December 1, 1977, at 450.

10. Plaintiff's Exhibit No. 62, Appellant's Appendix at 297.

11. Trial Transcript, December 1, 1977, at 376.

12. Trial Transcript, November 28, 1977, at 85; Trial Transcript, November 29, 1977, at 106–08, 118–20.
    Appellant also introduced evidence that she was passed over for promotion on several occasions. *See, e. g.,* Defendant's Exhibit No. 10, Appellant's Appendix at 533; Plaintiff's Exhibit No. 53, Appellant's Appendix at 292.
    Although there was conflicting evidence, the trial court found that Appellant was not promoted sooner because of an unwritten NIH policy that an employee not be promoted in grade when pursuing a graduate degree, using NIH laboratory facilities for study purposes, being permitted a flexible work week, and hav-

ing one of NIH's scientists act as thesis supervisor, since those employees are primarily working for themselves. Findings of Fact Nos. 27 and 88. The Court also found that exceptions were made to this policy. Findings of Fact No. 29. Although this Court has serious questions regarding this alleged unwritten policy, we need not now determine whether Findings of Fact Nos. 27 and 88 are clearly erroneous.
    Dr. Davis also alleged numerous other discriminatory acts and acts of reprisal for her having filed a discrimination complaint. It is unnecessary to detail these allegations herein.

13. Trial Transcript, December 6, 1977, at 781.

14. Trial Transcript, December 5, 1977, at 562.
    That career ladder has been in effect for Chemists in Intramural Research at NIH for 10–12 years. At trial, there was also conflicting evidence that the career ladder ranged from GS–5 to GS–12 or GS–15. Trial Transcript, November 29, 1977, at 149; Trial Transcript, December 5, 1977, at 511.

15. Trial Transcript, December 7, 1977, at 888–93.

16. *See* page —— of 198 U.S.App.D.C., page 960 of 613 F.2d, *infra.*

17. Trial Transcript, December 7, 1977, at 882.

tion is usually, although not always, held by a person with a Ph.D. or an M.D. degree.[18] NIH had created a staff fellowship program for new Ph.Ds., to permit them the opportunity to both develop and prove their capabilities to function in the innovative and creative manner required of independent investigators.[19] An inexperienced Ph.D. is almost never hired as an independent investigator without first participating in the staff fellowship program.[20]

## II. APPELLANT'S STATISTICAL EVIDENCE

The abundant relevant statistical data presented to the trial court may be divided roughly into three categories: (1) data indicating disparity in grade and salary structure between male and female employees at NIH, and NHLBI; (2) data indicating disparity in promotion rates of men and women employees at NIH and NHLBI; and (3) data indicating disparity in grade and salary structure of male and female employees at NHLBI with regard to their education.

The category one statistics reveal that the upper grade and salary structure at NIH and NHLBI is overwhelmingly made up of male employees. For example, as of September, 1975, 36.1% of all male NIH employees held positions at or above the GS–13 level, while only 4.8% of female employees held positions at those levels. Appellant's statistics indicate that these figures varied little from similar figures for January, 1972.[21] In September, 1975, 78.7% of NIH employees holding GS–13 level positions were male and 21.3% were female.[22]

Approximately 39.2% of all the GS rated employees at NIH in September of 1975 were men; 60.8% were women.

For fiscal year 1976, 46.2% of all male NHLBI employees held positions at or above the GS–13 level, while only 7.3% of female NHLBI employees held positions at those grade levels.[23] For this same period of time, 68.4% of NHLBI employees holding GS–13 level positions were male and 31.6% were female.[24] 40.5% of the GS rated employees at NHLBI were males at that time, and 59.5% were females.

The category two statistics indicate that the rate of promotions at higher levels was much higher for male GS employees at NIH and NHLBI than for female GS employees. For example, in fiscal year 1974, 55.8% of the professional NIH GS employees who were promoted were women. Approximately 58% of the professional male NIH employees who were promoted were at the GS–13 level and above while only 12.1% of the professional female NIH employees who were promoted were at GS–13 and above.[25]

For the years 1972–1976, 37.7% of the male employees at NHLBI who were promoted were at the GS–13 level and above, as compared to 4.8% of the female employees at NHLBI who were promoted.[26]

Category three statistics show that, among employees with doctorate degrees, there is a tendency for males to be employed at higher grade levels than females. For example, of the professional employees at NHLBI in October, 1975, 81% of the males with Ph.Ds. held GS–14 positions or above, while only 41.2% of the females with

18. Trial Transcript, December 7, 1977, at 882–83.

19. Trial Transcript, December 7, 1977, at 882–83.

20. Trial Transcript, December 7, 1977, at 883, 936.

21. Plaintiff's Exhibit No. 1, Appellant's Appendix at 88.

22. Plaintiff's Exhibit No. 2, Appellant's Appendix at 94.

23. Plaintiff's Exhibit No. 6, Appellant's Appendix at 114.

24. Plaintiff's Exhibit No. 5, Appellant's Appendix at 103.

25. Plaintiff's Exhibit No. 5, Appellant's Appendix at 103.

26. Plaintiff's Exhibit No. 16, Appellant's Appendix at 153.

Ph.D. degrees were in GS–14 positions or above.[27]

In October of 1975, male professional employees at NHLBI holding Ph.D. degrees had an average grade of 14.22, while the corresponding average grade for female Ph.Ds. was 13.47.[28] For that same year, the average grade level for male NHLBI chemists within the division of Intramural Research was 14.28, and the average grade level for female NHLBI chemists within that division was 13.29.[29]

## III. PRIMA FACIE CASE

The primary issue on appeal is whether the trial court erred in its determination that Dr. Davis failed to make out a *prima facie* case of discriminatory promotion practices.[30] In particular Appellant challenges the district court's Conclusions of Law that (1) statistics alone may not prove a *prima facie* case in an individual, as opposed to a class action, discrimination case,[31] and (2) Appellant's statistics were irrelevant because they included no information on the qualifications of those available for promotions.[32] For the reasons discussed below, this Court concludes that the trial court erred and that the action must be reversed and remanded.

■ A Title VII plaintiff carries the initial burden of presenting a *prima facie* case

of employment discrimination. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

> The method suggested in *McDonnell Douglas* for pursuing this inquiry . . . was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.

> . . . . .

> A *McDonnell Douglas* prima facie showing is not the equivalent of a factual finding of discrimination . . . . [I]t is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not those actions were bottomed on impermissible considerations.

*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 2949, 2951, 57 L.Ed.2d 957 (1978). After a *prima facie* case has been made, the burden shifts to the employer to "prov[e] that he based his employment

27. Plaintiff's Exhibit No. 9, Appellant's Appendix at 129.

28. Plaintiff's Exhibit No. 9, Appellant's Appendix at 131.

29. Plaintiff's Exhibit No. 10, Appellant's Appendix at 137.

30. The trial court's fourth Conclusion of Law, holding that allegations of any acts occurring prior to February 4, 1974, were not properly before the Court, is correct only insofar as it applies to Appellant's claims of discrimination in her hiring. That is the date thirty days prior to the date on which Dr. Davis filed an informal complaint with her EEO counselor. 5 C.F.R. § 713.214 states in pertinent part:

> The agency may accept the complaint for processing in accordance with this subpart only if—
>   (i) The complainant brought to the attention of the Equal Employment Opportunity

Counselor the matter causing him to believe he had been discriminated against within 30 calendar days of the date of that matter, or, if a personnel action, within 30 calendar days of its effective date . . . .

Although Appellant's hiring in the context of this case constituted an isolated and completed act, her allegations of discriminatory promotion practices and related acts, and her allegations of harassment and retaliation, constitute continuing violations not subject to the normal time limitations for filing. *See Macklin v. Spector Freight Systems, Inc.,* 156 U.S.App. D.C. 69, 478 F.2d 979 (D.C. Cir. 1973); *Loo v. Gerarge,* 374 F.Supp. 1338 (D.Hawaii 1974). In any event, it appears that Appellant has abandoned her hiring claims on appeal.

31. Conclusions of Law No. 3.

32. Conclusions of Law No. 2.

decision on a legitimate consideration, and not an illegitimate one such as race." *Furnco, supra,* 98 S.Ct. at 2950. *See also Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 259 (3rd Cir. 1972). The burden of persuasion then shifts back to the plaintiff, who "must be given the opportunity to introduce evidence that the proferred justification is merely a pretext for discrimination." *Furnco, surpa,* 98 S.Ct. at 2950.

### A. Statistical Evidence In An Individual Employment Discrimination Case

■ Statistical evidence is merely a form of circumstantial evidence from which an inference of discrimination may be drawn. The invocation of statistical data works no magical incantation. As with any circumstantial evidence, the usefulness of statistical evidence "depends on all of the surrounding facts and circumstances." *Teamsters, supra,* 431 U.S. at 340, 97 S.Ct. at 1857. Statistical proof may alone be used, without presentation of specific instances of discrimination, to establish a *prima facie* case of employment discrimination.[33] *Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Teamsters, supra,* 431 U.S. at 339, 97 S.Ct. 1843; *Kinsey v. First Regional Securities, Inc.,* 181 U.S.App.D.C. 207, 216, 557 F.2d 830, 839 (D.C. Cir. 1977).

■ This is so in an individual action as well as in a class action. We have previously indicated,[34] and now explicitly hold, that statistical evidence may establish a *prima facie* case of employment discrimination in an individual case. The trial court's conclusion that such evidence has less probative value in an individual action than in a class action is in error.[35]

■ Statistical evidence is typically utilized in class actions to establish *prima facie* case demonstrating a pattern-or-practice of unlawful discrimination. *See Teamsters, supra,* 431 U.S. at 336–40, 97 S.Ct. 1843. An individual claimant in a class action need additionally establish only that he or she is a member of the class and has been denied a promotion or other employment benefit during the period of the class discrimination in order to recover for particularized injuries.[36] An employer may defeat that right to recovery by sustaining its burden of proving either that the plaintiff's statistical proof of class discrimination is inaccurate or insignificant, or that the individual claimant was denied an employment benefit for lawful reasons.[37]

---

**33.** Dr. Davis also presented to the trial court evidence of numerous specific instances of discrimination, and the Defendant-Appellee introduced opposing evidence. This need not be detailed in view of this court's determinations herein.

**34.** *Hackley v. Roudebush,* 171 U.S.App.D.C. 376, 426, 520 F.2d 108, 158 (D.C. Cir. 1975); *Kinsey, supra,* 181 U.S.App.D.C. at 216, 557 F.2d at 839.

**35.** *See Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Machine Operators,* 525 F.2d 1354, 1358 (9th Cir. 1975); *Muller v. United States Steel Corporation,* 509 F.2d 923 (10th Cir. 1975).

In each of the Eighth Circuit cases relied upon by Appellee and the trial court, there was evidence of a legitimate, nondiscriminatory basis for the employment action, or that the statistical proof was unreliable, suggesting that the holding in those cases was that the employer had carried its burden of rebuttal. *See Harper v. Trans World Airlines, Inc.,* 525 F.2d 409 (8th Cir. 1975); *King v. Yellow Freight System, Inc.,* 523 F.2d 879 (8th Cir. 1975); *Terrell v. Feldstein Co.,* 468 F.2d 910 (5th Cir. 1972).

However, to the extent that language in those decisions suggests that statistical proof might establish a prima facie case in a class action only, we reject that position.

**36.** Appellant Dr. Davis established these elements before the trial court. *See* pages ——– —— of 198 U.S.App.D.C., pages 958–959 of 613 F.2d, *supra.*

**37.** [The plaintiff's] initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers . . . At the initial, "liability" stage of a pattern or practice suit the [plaintiff] is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiff's] proof is either inaccurate or insignificant. . . .

If an employer fails to rebut the inference that arises from the [plaintiff's] prima facie

Just as statistical proof of a "broad-based policy of employment discrimination [provides] reasonable grounds to infer that individual [employment] decisions were made in pursuit of the discriminatory policy and . . . require[s] the employer to come forth with evidence dispelling that inference" in a class action,[38] so too should the use of statistical evidence have equal force and effect in an individual discrimination case. The Supreme Court in the *Teamsters* case explained its rationale for permitting a plaintiff to present a *prima facie* case in a class action through statistical evidence:[39]

> Although the prima facie case did not conclusively demonstrate that all of the employer's decisions were part of the proved discriminatory pattern and practice, it did create a greater likelihood that any single decision was a component of the overall pattern. Moreover, the finding of a pattern or practice changed the position of the employer to that of a proved wrongdoer. Finally, the employer was in the best position to show why any individual employee was denied an employment opportunity. Insofar as the reasons related to available vacancies or

the employer's evaluation of the applicant's qualifications, the company's records were the most relevant items of proof. If the refusal to hire was based on other factors, the employer and its agents knew best what those factors were and the extent to which they influenced the decisionmaking process.

This same reasoning applies in an individual action.

**B. *Nature of Statistical Evidence Probative of and Sufficient to Prove a Prima Facie Case of Discrimination with Regard to Promotions***

Appellant's statistical data included in what has previously been designated category number one compares the sexual composition of the upper grade and salary positions at NIH and NHLBI with the overall sexual composition of those organizations. This data is probative evidence from which a court may infer discriminatory animus.

▮ The proper comparison is between the composition of the relevant work force and the qualified population in the relevant labor market.[40] In the context of a promo-

case, a trial court may then conclude that a violation has occurred and determined the appropriate remedy. Without any further evidence from the [plaintiff], a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice . . . .

When the [plaintiff] seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. . . . [T]he question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.

The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The [plaintiff] need only show that an alleged

individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. As in [*Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976)], the burden then rests on the employer *to* demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Teamsters, supra*, at 361–62, 97 S.Ct. at 1867–68.

38. *Teamsters, supra*, at 359, 97 S.Ct. at 1866.

39. *Teamsters, supra*, at 359 n.45, 97 S.Ct. at 1867 n.45.

40. *Hazelwood School District, supra*, 433 U.S. at 308, 97 S.Ct. at 2742, a hiring case, states:

> [A] proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.

This Court in *Kinsey, supra*, 181 U.S.App.D.C. at 216, 557 F.2d at 839, applied a similar test:

> It has been further held that statistical disparity between the proportion of blacks in the employer's work force and the proportion

tion case such as is presently before the Court, it would be expected that, absent discriminatory promotion practices, the proportion of the protected group in each of the job classifications and grade levels would approximate the proportion of the protected group with the minimum necessary qualifications for promotion in the employer's labor force as a whole. *See Teamsters, supra,* at 339–40 n.20, 97 S.Ct. 1843.

■ The trial court criticized Appellant's statistics due to the lack of detailed information regarding qualifications of those available for promotions.[41] However, only the *minimum objective qualifications* necessary for one to be eligible for promotion must be considered in the statistical data presented initially by a plaintiff; not every conceivable factor relevant to a promotion decision must be included in the statistical presentation in order to make out a *prima facie* case.[42] For example, if a doctorate was necessary for an individual to be eligible for a position in the upper grade levels at NIH or NHLBI, then statistics on the relevant labor market would have to be so limited. The quality of education received by those eligible candidates, although perhaps a relevant factor in employment and promotion decisions, would not have to be provided for in the statistics initially proffered to make a *prima facie* case. Similarly, if a particular number of years of work experience were established as a minimum job criterion, then that would need to be reflected in the proffered statistics. If, however, work experience were only a factor to be considered in promotion decisions, a plaintiff's statistical data need not take that into account.

We are not suggesting that a plaintiff may not present statistical evidence of factors relevant to promotion other than the minimum objective qualifications necessary for eligibility. We are merely saying that he need not do so to establish a *prima facie* case. The defending party, with the greater access to statistical evidence of other relevant factors, may utilize such evidence in its rebuttal presentation.[43]

The record herein reveals that there are no minimum necessary objective qualifications for the senior scientific research staff position of independent investigator.[44] A doctorate is not a minimum necessary re-

of blacks in the relevant labor market constitutes a prima facie case of discrimination in violation of Title VII. . . .

Such evidence is equally valid in an upper level job discrimination case, provided the relevant labor pool is accurately defined, as to those persons possessing the qualifications which the employer requires.

**41.** Findings of Fact No. 129; Conclusions of Law No. 2.

**42.** *See Hazelwood School District, supra,* 433 U.S. at 308 & n.13, 97 S.Ct. at 2742 & n.13. In *Hazelwood,* the Court stated:

When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value. The comparative statistics introduced by the Government in the District Court, however, were properly limited to public school teachers, and therefore that is not a case like *Mayor v. Educational Equality League,* 415 U.S. 605 [94 S.Ct. 1323, 39 L.Ed.2d 630], in which the racial-composition comparisons failed to take into account special qualifications for the position in question. *Id.,* at 620–21 [94 S.Ct., at 1333–1334].

*Id.* The Court limited the relevant labor market to teachers, but did not require that the statistics reflect years of work experience, quality of training, and other potentially relevant factors. *See also Teamsters, supra,* 431 U.S. at 342 n.23, 97 S.Ct. 1843; *Rich v. Martin Marietta Corp.,* 522 F.2d 333 (10th Cir. 1975).

**43.** The trial court also criticized Appellant for including in her statistical evidence only General Schedule Employees, who constitute approximately 55–60% of all NIH employees, presenting statistics that failed to reflect additional degrees obtained by employees during their employment, basing many of her tables on cumulative totals of men and women above particular grade levels, and failing to limit many of her tables and charts to employees in the scientific field. Findings of Fact Nos. 127, 131, 132 and 134. However, Appellant's statistics are probative and relevant and Appellee has presented no evidence suggesting how the aforementioned criticisms make Appellant's statistical proof either inaccurate or insignificant.

**44.** *See* page —— of 198 U.S.App.D.C., pages 959–960 of 613 F.2d, *supra.*

quirement, and the required capabilities of innovation and creativity are subjective, not objective, criteria. Therefore, contrary to the district court's second Conclusion of Law, the bare showing made by Dr. Davis' category one statistics is adequate.[45]

■ In a promotion case such as that presented to this Court, the organization in which the plaintiff is an employee is appropriately utilized as the relevant labor market.[46] At NIH approximately 75% of the positions at GS-11 and above are filled by promotion from within rather than recruitment from without.[47] Therefore, Appellant's statistical data included in category number one, indicating a substantial disparity between the percentage of female employees in the upper grade and salary positions at NIH and NHLBI and the overall percentage of female employees in those organizational units, is sufficient to make out a *prima facie* case of discrimination.

Appellant's statistical data included in category number two also constitutes probative evidence from which discriminatory intent might be inferred.[48] Absent discriminatory promotion practices, similar promotion rates for male and female employees in the higher job classifications and grade levels who possess the minimum objective qualifications necessary for those positions would be expected. Dr. Davis' statistical evidence indicated that male GS employees in the higher grades at NIH and NHLBI were promoted at a substantially higher

rate than similarly situated female employees.

Appellant's statistical *prima facie* case is bolstered by the subjective and ad hoc nature of Appellee's promotion decisions. No objective criteria were established to guide the promotion decisions of supervisors, branch chiefs and ad hoc promotion panels, who were predominantly male.[49] This Court agrees with the Eighth Circuit Court of Appeals in *Rogers v. International Paper Co.*, 510 F.2d 1340 (8th Cir. 1975), *vacated on other grounds*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), *reinstated with modification on other grounds*, 526 F.2d 722 (8th Cir. 1975), which stated:

> Greater possibilities for abuse . . . are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus, it is especially important for courts to be sensitive to possible bias in the hiring and promotion process arising from such subjective definition of employment criteria.

Appellee's promotion procedures are highly suspect and must be closely scrutinized because of their capacity for masking unlawful bias.[50] The "lack of meaningful standards to guide the promotion decision, whereby there is some assurance of objec-

**45.** Even if we were to have concluded that a doctorate was a minimum necessary requirement, this Court would still conclude that Appellant has presented a prima facie case. The statistical evidence included in category three indicates disparities in grade and salary of male and female employees with equivalent educational degree qualifications.

**46.** *See Stewart v. General Motors Corp.*, 542 F.2d 445, 449–50 (7th Cir. 1976) *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105; *Rich, supra*, at 347; *Wetzel, supra*, at 257–58.

**47.** Trial Transcript, December 6, 1977, at 752.

**48.** *See Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1190–92 (5th Cir. 1976); *cert. denied*, 429 U.S. 861, 97 S.Ct. 163, 50 L.Ed.2d 139 (1976);

*Rich, supra*, at 347; *Wetzel, supra*, at 258; *Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972).

**49.** *See* page —— of 198 U.S.App.D.C., pages 959–960 of 613 F.2d, *supra*.

**50.** [S]ince there were no written criteria for promotion, a racially discriminatory denial of promotion could easily pass as one motivated by a desire to accord appellant greater training.
*Hackley, supra*, 171 U.S.App.D.C. at 427, 520 F.2d at 159. *See also Kinsey, supra*, 181 U.S.App.D.C. at 215, 557 F.2d at 838; *Rich, supra*, at 348; *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 550 (4th Cir. 1975); *Rowe, supra*, at 358–59.

tivity . . . encourage[s] and foster[s] discrimination." [51]

## IV. CONCLUSION

For the reasons discussed above, we find that the trial court erred in its determination that Dr. Davis failed to make out a *prima facie* case of discrimination. The judgment of the trial court is reversed and remanded. On remand, the trial court must determine whether Appellee has sustained its burden of showing either that Appellant's statistical proof is inaccurate or insignificant, or that she was denied promotion for lawful reasons. The trial court shall also consider Appellant's allegations of continuing harassment and retaliation dating back to her initial employment with NIH.

MacKINNON, Circuit Judge (dissenting):

Appellant, a GS–9 chemist at the National Institute of Health, seeks advancement to a GS–12 position, and a chance to prove herself as an independent investigator, on the ground that she has been discriminated against in promotion to highly skilled positions because of her sex. I would affirm the trial court's judgment for Appellee for four reasons. First, even assuming Appellant established a *prima facie* case of individual sex discrimination by the use of statistics, once the burden shifted to Appellee, it clearly proved that Appellant was not promoted because she simply was not qualified. Second, the statistics introduced by Appellant are not sufficiently detailed to establish a *prima facie* case of individual sex discrimination in promotions to these highly skilled positions. Third, even assuming the statistics are appropriate *in form* to establish a *prima facie* case, they do not come close *in substance* to establishing a *prima facie* case of individual sex discrimination. Finally, apart from the statistics, Appellant failed to sustain her burden of proving the qualification element of a *prima facie* case.

### I.

Appellant graduated in 1968 from Duke University with a Bachelor of Science degree. In her science courses, which comprised seventy percent of her classes, she received C's, D's, and F's. Nevertheless, she was hired that year by the National Institute of Health as a chemist with a GS–5 rating. Men and women with better qualifications were hired as GS–7 chemists, and the majority of chemists were women.

Though she thereafter acquired a Masters and Doctorate degree, her promotions came slowly. Dr. Donald Frederickson, one of her superiors, expressed the opinion that she was less sufficient as a chemist than some of her peers. (Tr. 882) In a meeting held on March 18, 1974 to obtain the independent assessment of all the professional staff concerning the chemists in the laboratory, the members of the staff who were familiar with Appellant's work found that she was average as compared to other chemists. (Tr. 880–81; DX–4)

The record also reflects that when she was working on a project for a Dr. Assman, one of her Ph.D. thesis supervisors, she was unable to obtain usable data while others in the Heart Institute were assaying the same enzyme and doing so successfully. (Tr. 974) Dr. Assman did not recommend her for a promotion, although he recommended two other chemists, including a woman. (Tr. 981–82) Appellant's superior at the time of the trial, Dr. Pisano, testified that he had told her he rated her the lowest of the three post-doctorate employees that were assigned to him. He further stated she did not spend as much time in the laboratory as other post-doctorate employees. (Tr. 1007–1008)

The evidence at trial also indicates that Appellant was a difficult employee to get along with. This is indicated by the fact that when she started working on her Ph.D. the NHLBI staff thought it necessary to confirm in writing the agency policy that a chemist who achieves an advanced degree is not assured a senior research staff position (independent investigator) when a Ph.D. is

51. *Muller, supra,* at 927–28.

completed. The memorandum of understanding stated that this policy applied to her. (Tr. 133–34, 146–47, 179, 866–67, PX 95) Previously this policy had been expressed in the form of verbal understandings, but the staff considered that a verbal understanding with Appellant would be impossible. (Tr. 935) In addition, Dr. Frederickson had informed Appellant one month after she had commenced her Ph.D. program that there was no guarantee she would receive the independent investigator position upon completion of the degree. (Tr. 458; DX–11)

Another important fact brought out at trial was that Appellant was not part of the staff fellowship program. In that program, employees with Ph.D.s have the opportunity to increase their skills while proving their developing capacities for innovative creativity.[1] The agency rarely offers the independent investigator positions to an inexperienced Ph.D. who is not participating in the program. Even then, not all staff fellows are guaranteed the positions. Edward Nicholas, Director of Personnel at NIH, testified that 75% of NIH senior level positions were filled from within the agency, and these promotions are almost exclusively from members of the program. It is apparent from Appellant's findings of fact that she refused to enter the fellowship program. By refusing, she is suffering one of the consequences.

These facts clearly indicate that Appellant had frequent personality conflicts with various of her superiors. As concluded by the trial court, her failure to be promoted resulted from this fact, and the fact that she was not as qualified as her peers to take on the heavy responsibility of a high level independent investigator. It is purely incredible to assume, as Appellant would have us do, that the only reason she is not a GS–12 is because she is a woman. Appellee sustained its burden of proving that the promotion decision was based on a legitimate consideration. *Furnco Constr. Corp.*

*v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Further, Appellant presented no evidence that Appellee's justification was a pretext for discrimination. *Id.* at 578, 98 S.Ct. 2943. Thus, the trial court's conclusion, based on all of the evidence, that Appellee did not violate Appellant's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, is not clearly erroneous and should be affirmed.

## II.

The second reason I would affirm the trial court's judgment for Appellee is that Appellant's statistics were inadequate in form to establish a *prima facie* case of individual sex discrimination to the highly skilled chemist position. This is the principle issue discussed in the majority opinion. The opinion approves of the use of statistics which merely reflect the "minimum objective qualifications" for the positions under review. As support for this test, it cites *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). However, the Supreme Court nowhere establishes this as the standard to be used, and the two cases are clearly distinguishable from Appellant's. It appears that the minimum qualification needed in the *Teamsters* case was whether the individuals being considered for hire could drive a truck—a fairly fungible skill. Similarly, *Hazelwood* involves hiring discrimination of public school teachers where far less skill, training and experience are needed than for chemists doing advanced medical research. Since both cases concerned more common skills and occupations than research chemists, a litigant's statistics utilizing minimum objective qualifications for hiring would be much more reliable to establish a *prima facie* case of an employer's discrimination.

---

1. As noted at trial and in the majority opinion, independent investigators must be able to perceive a specific research problem and develop a hypothesis and protocol for determining its truth or falsity. (Tr. 882)

We are here considering research employees engaged in some of the most advanced medical research on the outer horizons of present knowledge. The qualifications for such work should be preeminent. If employees of average ability are filling these positions the public is not getting the quality research that it expects and needs. I would hold that the statistical data introduced by Appellant does not prove a *prima facie* case. Because of the great degree of skill needed for the job, I would require her initial proof to descend more to particulars and to touch upon the *obvious* qualifications considered for the job. Just because the qualities demanded are not written down by the employer does not mean they are not considered by it, or are not obvious to the litigants and the Court. As the opinion in the *Teamster* case states, statistics may be considered *as they relate to surrounding facts and circumstances.* 431 U.S. at 340, 97 S.Ct. 1843. Similarly, the Supreme Court in *Hazelwood School District* noted that

> [w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13. For the Court to accept as a *prima facie* case from disappointed chemists statistics that reflect only grade levels, sex, and edu-

cational degrees obtained prior to hire is a waste of the Court's time, and a serious disadvantage to the employers to whom the burden of proof is shifted.

The trial court concluded that Appellant's statistics were "irrelevant because they include no information regarding qualifications of those males and females available for hiring or promotions." (App. Vol. I at 23) I would not go as far as the trial court; the statistics *are* relevant, but are alone insufficient in form to establish a *prima facie* case of discrimination here because they do not reflect more of the obvious qualifications considered for the jobs. As Appellant's own expert testified, the statistics do not reflect the pertinent employees' ages, quality of education, previous work experience, and degrees obtained subsequent to hire at NHLBI.[2] (Tr. 705, 736) I also note the statistics do not consider the experience acquired since the various graduate and post-graduate degrees were completed. All of these facts undoubtedly are considered by the employer when determining whether to promote a chemist. It must be stressed that this case demands more particularized statistics for the purpose of proving a *prima facie* case of sex discrimination because of the uniqueness of the positions being considered. The skills under examination are certainly not fungible, and thus the minimal objective statistics presented by Appellant are insufficient.[3]

---

**2.** If the statistics do not reflect degrees obtained subsequent to hire by Appellee, they do not even reflect Appellant's degrees.

The Fourth Circuit discussed this issue in *Roman v. ESB, Inc.,* 550 F.2d 1343 (4th Cir. 1976) (en banc), where it reviewed the plaintiff's attempt at proving that the employer's wage scale favored whites over blacks.

> The district court examined these contentions and rejected an attempt by the appellants to establish such a disparity by average wages of whites and blacks on a plantwide scale without regard to differences in level of skill, education and training. We agree. *Id.* at 1355.

Similarly, in *Dobbins v. Local 212, International Brotherhood of Electrical Workers,* 292 F.Supp. 413, 445 (S.D.Ohio 1968), the Court stated:

> It is one thing to presume or assume, prima facie-wise or otherwise, that a significant

number of a group have the qualifications for schooling or voting, or jury service. It is another thing to assume, prima facie-wise or otherwise, that because a certain number of people exist, be they W[hite] or N[egro], that any significant number of them are lawyers or doctors, or merchants, or chiefs—or to be concrete, are competent plumbers or electricians, or carpenters.

*See also Hester v. Southern Ry. Co.,* 497 F.2d 1374, 1379 n. 6 (5th Cir. 1974) ("A more significant comparison might perhaps be between the percentage of blacks in the population consisting of those able to type 60 wpm or better and the percentage hired into the Data Typist position by Southern.").

**3.** The possible use of more particularized statistical evidence was explained by four economists in Gwartney, Asher, Haworth, Haworth, *Statistics, the Law and Title VII: An Economists View,* 54 Notre Dame Law. 633 (1979):

## III.

Third, even if I were to agree with the majority that the statistics need only reflect the "minimum objective qualifications" for the chemist positions, I fail to see how Appellant's statistics in substance establish a *prima facie* case.

Courts have held that in class action cases, discrimination may be proved by statistics. Of course it may, but the statistics must be adequate to make out the *prima facie* case. In cases of individual discrimination, the use of statistics is less clear. In those cases where the complaining party was a member of a group that was almost *totally excluded, Kaplan v. Intern. Alliance of Theatrical and Stage Employees,* 525 F.2d 1354 (9th Cir. 1975); *Muller v. United States Steel Corporation,* 509 F.2d 923 (10th Cir. 1975), the discrimination against the individual is fairly obvious.[4] But this is not such a case. The statistical data here is equivocal and inconclusive. Appellant introduced a great deal of data, but much of it points in different directions. From the statistics furnished it may be concluded that women as a group are *not* discriminated against generally because women constitute most of the employees at the agencies polled. For instance, at the NHLBI, 60.7% of the GS employees in fiscal 1972 were women. In 1974, the figure was 59.4% and in 1976 it was 59.5%. (App. Vol. I at 30–31) In 1974, 55.8% of the professional NIH GS employees who were promoted were women. Therefore, these statistics show that women, as a group, were certainly not excluded from hiring and promotion.

But Appellant's principal complaint is that women were disproportionately represented in the higher grades. Because the statistics are so inconclusive, it is important to look at them in detail to discern reasons for this disparity, noting that this task should normally be left to the judgment of the trial court as the trier of fact. *Hazelwood School District v. United States,* 433 U.S. at 312, 97 S.Ct. 2736. However, be-

Since lawyers and judges seldom have been trained in economics and statistics, the legal process has, heretofore, failed to appreciate fully the applicability of earnings determination estimates derived via regression analysis or of analysis of various techniques applied to class definitions and representation questions. Of course, a multiplicity of "skill factors" will generally be relevant to the total evaluation of an employee. Sometimes it will be impossible to fully qualify a "skill factor." Other times, it will be necessary to use an indirect indicator to measure the impact of a factor. For example, in instances where cognitive skills are important to job performance, years of schooling might be utilized as an indicator of cognitive skills, since data on the latter are not directly available. Fortunately, many potentially important skill factors are quantifiable. Employee data are usually available for skill factors such as (a) years of work experience in related areas, (b) years of vocational training, (c) seniority (work experience with current employer), (d) quantity of schooling, (e) quality of schooling, (f) typing words per minute and (g) indicators of employee dependability (*e. g.,* a low absenteeism rate). Both economic theory and common sense suggest that these skill indicators will influence the productive contribution of employees and, in turn, their earnings, occupational distribution and even their commonality and typicality under the definition of a class. When white and black workers possess differing amounts of these skill factors, racial skill differentials are clearly a potential "nondiscriminatory explanation" of the disparity between the unadjusted average earnings or representation of white and black employees and may be helpful in defining a class.

*Id.* at 655–56.

4. For example, the statistics in the *Teamsters* case exemplify the great disparity between racial classes employed as truck drivers.

As of March 31, 1971, shortly after the Government filed its complaint alleging systemwide discrimination, the company had 6,472 employees. Of these, 314 (5%) were Negroes and 257 (4%) were Spanish-surnamed Americans. Of the 1,828 line drivers, however, there was only 8 (0.4%) Negroes and 5 (0.3%) Spanish-surnamed persons, and all of the Negroes had been hired after the litigation had commenced. With one exception—a man who worked as a line driver at the Chicago terminal from 1950 to 1959—the company and its predecessors *did not employ a Negro on a regular basis as a line driver until 1969.* And, as the Government showed, even in 1971 there were terminals in areas of substantial Negro population where all of the company's line drivers were white.

*International Brotherhood of Teamsters v. United States,* 431 U.S. at 337, 97 S.Ct. at 1855. (Emphasis in original) In such a case, statistics are valid.

cause of the majority's action in this case, it is necessary to review the evidence.

One of the clearest explanations for the disparity is that there are simply more men than women with the higher degrees to choose from for hiring and promotions. This fact is evidenced by the findings that women only hold 10% of the M.D.s in the United States (Tr. 1049, 1050), and they received only between 14% and 16.3% of the Ph.D.s conferred in select physical and life sciences between 1973 and 1976. (Tr. 763, 764, 1047; DX–24) Thus since men numerically dominate the relevant work force it follows naturally that there are more male than female Ph.D.s and M.D.s employed by Appellee.[5] Another relevant fact is the finding in Appellant's statistics that nearly two-thirds of the employees who separated from NHLBI in 1974 were female. Women as a group, therefore, were acquiring less seniority for purpose of advancement. Finally, it is conceivable that women have been hired in greater numbers after the enactment of Title VII in 1964 and the government's expanded concern over affirmative action. If this premise is true, then the disparity between the number of men and women in the upper grade levels will logically continue for some time until the women as a group gain more experience and seniority.

The most helpful chart introduced by Appellant compares the average GS grade, average length of service, and average age of NHLBI chemists for October, 1975. (App. Vol. I at 137) Unfortunately, she introduced only one such chart. However, the figures it exhibits certainly do not show a clear case of sex discrimination. Of the Ph.D.s, eighteen were men and seven women. The men had an average grade of 14.28 while the women's average grade was 13.29. This in itself is not dispositive, considering the factors discussed above. In addition, the men had approximately one more year's service than the women.[6] It would be exceptional if the figures for both sexes were identical. For chemists holding only a M.S. or B.S. degree, women fared much better than men. In 1975, although there were almost an equal number of men and women employed with those degrees, the women held a higher average Civil Service grade than the men. The women did have a higher average age and length of service in those groups. However, it would be no more credible for a man to claim sex discrimination on the basis of those figures because, as is stated above, it would be exceptional if they were identical. The only conclusion the trial court should have drawn is that the figures are so close, and the reasons for any disparities so obvious, that Appellant failed to establish a *prima facie* case.[7]

5. In 1974, NHLBI's professional staff included 52 Ph.D.s and 9 M.D.s who were male, and 14 Ph.D.s and 3 M.D.s who were female. (App. Vol. I at 141) The figures for 1975 were 63 Ph.D.s and 10 M.D.s who were male, and 17 Ph.D.s and 3 M.D.s who were female.

6. The length of service is important when tied in with the enactment of Title VII of the Civil Rights Act of 1964. The average length of service for men and women chemists at NHLBI in 1975 was 15.6 and 14.9 years respectively. Since, most of the chemists were employed prior to the enactment of Title VII and most prior to that time were men, it would be logical that there are more men in these positions at the present time.

This situation contrasts with the *Teamsters* case, where the Supreme Court found the pattern of racial discrimination to continue in the employer's hiring practices long after Title VII was enacted. 431 U.S. at 341, 97 S.Ct. 1843. The employer had argued the disparities existed because of a pre-Act imbalance and post-Act low personnel turnover. The Court stated this "argument would be a forceful one if this were an employer who, at the time of suit, had done virtually no new hiring since the effective date of Title VII." *Id.*

7. This case bears much similarity to *Roman v. ESB, Inc.,* 550 F.2d 1343 (4th Cir. 1976) (en banc) where the Court held that the statistical evidence introduced at trial did not prove racial discrimination in hiring and promotions. ESB had an overall non-white employee percentage of 54% prior to a layoff, which was well above the percentage of the black population in the community.

Overall, whites do outnumber blacks in the higher job classifications and blacks outnumber whites in the lower classifications, but any imbalance is not striking. . . .

The spread here of blacks through the labor grades is not such as would alone create a *prima facie* case of discrimination. This is

## IV.

Even apart from the statistics, Appellant failed to prove a *prima facie* case because she failed to prove she was qualified for the job. This proposed holding is different from that discussed in Part I, where it was assumed that even if she had established a *prima facie* case, the Appellee had in turn sustained its burden of proving *on rebuttal* that she was not promoted for reasons other than her sex. Here it must be emphasized that Appellant initially carries the burden of proving she is qualified for the job to first make out her *prima facie* case.

In 1973, the Supreme Court established the necessary ingredients for proving a *prima facie* case in a private, non-class action discrimiration suit in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 68 (1973).

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied *and was qualified* for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from person of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824 (Emphasis added). After noting that statistics may be helpful to plaintiffs in proving a pretext for discrimination, i. after the employee has proven a *prima facie* case and after the employer has induced evidence that the employment decision was based on reasons other than race sex, the Court cautioned that such general determinations "may not be in and of themselves controlling as to an individualized hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire." *Id.* at 805 n. 19, 93 S.Ct. at 1826 n. 19.

Subsequent Supreme Court cases approving the use of statistics in Title VII cases have usually addressed either class action suits or "pattern and practice" suits brought by the government, neither of which specifically address individual employees. *See Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The Supreme Court's ruling in *Furnco Const. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) clarifies this issue.[8] *Furnco* is the only post-*McDonnell Douglas* case which addresses individual discrimination. The Court specifically applies the five-part test of *McDonnell Douglas,* and distinguishes *Furnco* from cases dealing with employment tests, particularized requirements, and "pattern and practice" cases. *Id.* at 575 n. 7, 98 S.Ct. 2943. The Court then noted that the *Furnco* employer had conceded for all its purposes that respondents were qualified, thus removing the issue from Supreme Court review. *Id.* at 576 n. 8, 98 S.Ct. 2943. Therefore, even though *Furnco* makes it clear that statistics are a relevant form of proof, the five-part test is still applicable.

The logical conclusion is that for suits like Appellant's, i. e. private, non-class action discrimination suits, the plaintiff must couple the optional use of statistical evidence with proof of personal qualification to make out a *prima facie* case. The majority opinion fails to specifically address this issue,

especially true light of the highly skilled work done by higher pay grade workers such as tool and.
*Id.* at 1353–54.

**8.** The *Furnco* Co also clarified that a *McDonnell Douglas* prima facie case only raises an "inference" of crimination because the Court presumes that acts, if otherwise unexplained, are "more likely than not based on the consideration of impermissible factors." 438 U.S. at 577, 98 S.Ct. at 2949. This finding by the Court is not the equivalent of an ultimate finding of fact.

For more detail on the two kinds of *prima facie* cases, *see* J. Wigmore, *Wigmore on Evidence* § 2494, at 293 (3d ed. 1940).

instead relying on the statistics alone, and the "minimum objective qualifications" to hold Appellant established a *prima facie* case. For all of the factual reasons expressed in Part I, it is submitted that Appellant has not sustained her burden of proving she was qualified to be an independent investigator.

## V.

I would find on the basis of the entire record that the trial court's conclusions that the Appellee had not engaged in sex discrimination in refusing to promote Appellant had not been shown to be clearly erroneous. In addition to a failure to make out a *prima facie* case on the basis of statistics, the judgments expressed by her superiors as to her ability, when coupled with the fact that the agency employs women in the agency and as chemists in excess of their ratio in the population strongly supports a conclusion on the merits that sex discrimination was not the reason she failed to be promoted. Rather it was a reflection of her average ability plus her failure to conform to general practices. Most important in this latter connection was her refusal to enter the staff fellowship program, one of the chief means used to select independent investigators.

To my mind this case presents an issue that is of great national concern—is the cry of discrimination going to be used as a means for the promotion of underqualified employees to positions requiring great ability? Chief Justice Burger expressed this very concern for a unanimous court (Justice Brennan not participating) in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a case upholding an employer's use of job testing which reasonably measures job performance.

> Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant.

*Id.* at 436, 91 S.Ct. at 856. Similarly, are the courts shifting to these employers an unfair burden of proof because of a litigant's scanty *prima facie* case based on inconclusive statistics? Employers should resist all unsupported claims less the efficiency of our work force be diminished.

To the extent indicated above I respectfully dissent from the majority opinion.