**Rosabelle V. JUDGE, Plaintiff,**

**v.**

**John O. MARSH, Defendant.**

**Civ. A. No. 82–1635.**

United States District Court,
District of Columbia.

Dec. 12, 1986.

Wendy Kahn, Zwerling, Leibig & Kahn, Washington, D.C., for plaintiff.

Robert Selden, Asst. U.S. Atty., U.S. Attorney's Office, Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This action came before the Court for trial. At the conclusion of trial the Court requested the parties to submit proposed findings of fact and conclusions of law. The Court took the matter under advisement and herein issues its findings of fact and conclusions of law. Plaintiff, a black female, claims that she has been subjected to unlawful discrimination and retaliation in violation of 42 U.S.C. § 2000e–16 by defendant's failure to select her for promotions and to assign her higher performance and merit ratings. Upon consideration of all the evidence, the Court finds that plaintiff has failed to meet her burden with respect to these claims.

## FINDINGS OF FACT

Plaintiff Rosabelle Judge began working for the federal government in 1947. From 1968 through August, 1979, she was a program analyst, GS–13, in the finance job series at an Army installation in Worms, Federal Republic of Germany. During this time, she held collateral duty assignments in Equal Employment Opportunity ("EEO") and Federal Women's Program ("FWP").[1] She served as operating EEO Officer for HQ TASCOM in Worms for four years and as FWP Coordinator for HQ TASCOM for two years, both on a collateral duty basis. In August, 1974, Ms. Judge transferred to the EEO job series and took a position as EEO Specialist, GS–13, at Headquarters USAREUR, in Heidelberg, Federal Republic of Germany. Plaintiff still works in that capacity as Deputy EEO Officer of USAREUR.

The present action is based on four administrative claims, which will be treated separately for the sake of clarity. The first complaint, filed in 1978, involves the Department of Army 1977 Career Rating Panel's decision not to rate plaintiff as "Highly Qualified." On July 23, 1981, Ms. Judge filed two additional administrative complaints, the first of which alleges that discrimination and reprisal underlie plaintiff's non-selection for the position of EEO Officer at HQ USAREUR in 1981. The second claims that her non-selection for the FWP Manager's position in April 1981 was in reprisal for her earlier EEO complaint. Plaintiff's final administrative complaint, filed in 1983, contends that the rating she received in her Merit Pay Performance Appraisal for 1981–1982 was retaliatory.

A. *The 1978 Complaint—SKAP Rating*

In order to be promoted in the Federal Civil Service, one must apply and be selected for a vacancy at the next higher grade. The Army has a comprehensive Civilian Career Management Program that is an exception to the ordinary Merit Promotion Systems. Instead of applying for individual vacancies in job series covered by this program, employees enroll in the program and are referred for all vacancies for which they are rated best qualified and which match the employees' desired location and job type. The program establishes a plan for identifying employees' developmental needs, locality preferences, qualifications,

---

1. "Collateral duty" refers to part-time assignments given individuals whose primary duties are in another area. The initial collateral duty assignments plaintiff held in Worms in the EEO and FWP fields involved no more than 25% of her time.

skills, and abilities and for referring candidates for promotion or reassignment in various functional areas. Among these areas is Equal Employment Opportunity, added in 1976 as a separate functional field.

Careerists enrolled in the program are required to rate annually the degree to which they meet standards established for 26 rating elements grouped into four categories: technical qualifications, general qualifications, program management, and personnel management and communications. Ratings range from "A" (top level) to "E." Ratings are also assigned by the careerist's immediate supervisor, a reviewer (normally the second-line supervisor), and an *ad hoc* major command (MACOM) panel. A final assessment at departmental level is made by a Department of Army Civilian Career Screening Panel ("DA" or "SKAP Panel"). The DA Panel makes an overall evaluation in which a careerist may be rated highly qualified (HQ), qualified (Q), HQ with recommended lateral reassignment to enhance development (HQ/L), or qualified with recommended reassignment (Q/L). A Q rating is assigned to those who meet the minimum Office of Personnel Management standards for promotion but who do not meet the HQ criteria. These ratings of skills, knowledge, abilities, and personal characteristics are commonly called "SKAP" ratings.

In determining their initial and the overall rating, the DA Panel considers the ratings assigned by the careerist and the careerist's supervisor, as well as the accompanying supporting documentation known as "SKAP Packages." [2] Additionally, the EEO DA Panel established yearly crediting/rating plans against which each careerist's SKAP element ratings were measured, for purposes of the overall evaluation. These plans were not distributed in advance to careerists or their reviewing supervisors. The crediting plan used by the 1977 DA Panel required careerists to have a "B" in element 3 (titled "Staff Assistance") to be rated Highly Qualified for promotion to GS–14 level EEO Officer, EEO Specialist and Federal Women's Program Coordinator positions.[3] Although plaintiff sought promotion to the GS–14 level, and had given herself a B in element 3, her supervisor William Gibson and the DA Panel gave her Cs in this element. Mr. Gibson did not know that a C in this element would not meet the crediting plan promotion requirement, but he testified that C was nonetheless the appropriate rating for Ms. Judge at that time. Gibson stated that he had received complaints from people about their interactions with Ms. Judge, and ascribed these to plaintiff's strong personality. He described Ms. Judge as an abrasive person, whose high personal standards made her "come on hard" at times. Based on this assessment, Gibson felt a "C" was appropriate. Ms. Judge did not seek review of Gibson's rating, and challenges neither his motive in rating her nor the credibility of his statements at trial. Indeed, Mr. Gibson's testimony and demeanor made clear that he has a very high regard for Ms. Judge and her capabilities, and that he evaluated her

---

**2.** SKAP Packages are prepared by individual careerists, and are required to justify higher ratings. For the 1977 ratings, such written justification was needed to support B ratings, and A's could only be awarded by the DA Panel. In reconciling element ratings with the supporting SKAP Packages, the DA Panel could request additional information from a careerist or the careerist's reviewing supervisor: There was no limit on the amount of supporting documentation a careerist could submit with a SKAP package. Because the DA Panel would review the entire package, and could either raise or lower self-ratings accordingly, careerists often submitted long and detailed element justifications with their SKAP packages.

**3.** For certain elements, the crediting plan provided that the "B" standard meant not more than one C in the element grouping, or, for other elements, no less than C in any element grouping. Pltf.Exh. 25. Thus, for example, a careerist who received a C from the DA Panel on element 19 ("Planning, Org. & Control"), but had rated herself a B for that element and had received a B from her supervisor could be rated "HQ" under the crediting plan, even though the nominal crediting plan rating requirement for element 19 was a B. The plan clearly indicated which elements permitted this flexibility, and element 3 was not among them.

based solely on her performance and abilities.

Joseph Bennett, who chaired DA Panels for EEO SKAP review from 1976 to 1979, and chaired the 1977 Panel, testified at length about the procedures and review given careerists' SKAP Packages in 1977. With regard to Ms. Judge's SKAP Package, he noted that the overall C in element 3 was based largely on Gibson's rating; the Panel did not find that plaintiff had provided sufficient justification to support a higher rating.[4] The 1977 DA Panel generally concurred in Gibson's element ratings of plaintiff. In two elements the Panel gave her a B, though Gibson had rated her "C". In only one instance did the 1977 Panel lower a mark given by Gibson from B to C.

The 1977 DA Panel gave plaintiff 19 Bs and nine Cs in her final SKAP element rating. Gibson, on plaintiff's behalf, requested the DA Panel to reconsider their final rating, and was told that his C rating in element 3 had kept plaintiff from a HQ rating. He told Ms. Judge that he had requested reconsideration. Plaintiff's first independent response to the DA Panel's intitial rating, some three weeks after Gibson told her he had requested reconsideration, was to write to Clifford Alexander, Jr., Secretary of the Army, informing him that she intended to file a formal discrimination complaint, and requesting a personal interview. Neither plaintiff nor her supervisor submitted additional information for the DA Panel's reconsideration to justify a

B in element 3, and the Panel did not change their initial rating.

The overall Q rating Ms. Judge received kept her from being included on referral lists for GS–14 positions within the EEO program. Specifically, plaintiff contends that she was deprived of the following promotional opportunities: the 1978 selection of EEO Officer for the Corps of Engineers, and EEO Specialist, FWP Manager, filled by Raymond Turner (a black male) and Rosemary Howard (a white female), respectively; and the 1979 selections of Ben Johnson (a black male) as EEO Officer in Ft. Monroe, Virginia, and Rosemary Gnadt (a while female) as EEO Officer at the National Guard Bureau. Ms. Judge filed a formal administrative complaint of discrimination. After a hearing, the EEOC found that no discrimination occurred, and the Army's final decision concurred.

### B. *The 1981 Complaint*

In February, 1981, General Frederick Kroesen, Commander In Chief-USAREUR, selected Anita Gomez Troughten as EEO Officer to fill the vacancy left when William Gibson departed. Plaintiff had been one of three candidates recommended by a review panel for the position, and she wrote to General Kroesen on February 26 expressing dissatisfaction with her non-selection. She made no mention of filing an EEO complaint, although she contacted an EEO counsellor on Friday, February 27, 1981. On March 2, 1981, the following Monday, General Kroesen completed his review and SKAP rating of plaintiff. He

---

4. Plaintiff justified elements 1–6 with a single, comprehensive paragraph, which listed her duties and responsibilities in general terms. SKAP Packages of other careerists, rated at the same time, generally provided more detailed justification for their ratings. The DA Panel could look at SKAP Packages as a whole in evaluating their sufficiency. Plaintiff's claims that the Panel discriminatorily opted to evaluate her proffered justifications element by element, rather than in light of her whole Package was not supported by the evidence at trial. Joseph Bennett stated that plaintiff's SKAP Package was viewed as a whole, and pointed to specific deficiencies in the justifications offered by plaintiff and her supervisor. Plaintiff also offered statistics compiled from the results of the DA Panel's

review to support her claim of discriminatory evaluation standards and methods. Even assuming their validity, the statistics do not reflect the discrimination plaintiff seeks to prove. Further, they are drawn from such a small sample that they are of questionable worth in analyzing how black women, as a group, are treated by DA Panels. The Court is unable to draw generalized assumptions from these statistics to support Ms. Judge's claims that the Panel evaluated SKAPs in a discriminatory manner. The SKAP Package of each careerist necessarily reflected different facts justifying each grade, and the evidence did not reveal that factually similar SKAP Packages, presented in similar detail, received different treatment.

gave her 17 Bs and 11 Cs. On March 9, Anita Gomez Troughten declined the offer of EEO Officer. General Kroesen reconvened a review panel and ultimately selected Luther Santiful, a black male, for the position. Mr. Santiful had been the third of the candidates originally recommended. Ms. Judge amended her administrative complaint to add a claim of reprisal in her non-selection. Plaintiff challenges both the panel review process and General Kroesen's personal attitude as biased against black women. She further contends that her ultimate non-selection, in favor of Mr. Santiful, was in retaliation for her February 27, 1981 EEO complaint.

The selection of the EEO Officer followed the usual, two-tier review. Initially a list of eight qualified candidates was referred to General Kroesen. The list was in alphabetic order, and included Ms. Judge.[5] Upon receipt of the list, General Kroesen formed a Review Panel of senior officers to evaluate the candidates and to recommend several for selection. The Review Panel was chaired by Major General Charles Rogers (a black male), and included three white males, Major General Ernest Peixotto, Brigadier General W.E. Alley and Frank Cipolla, and a black female, Brigadier General (then Colonel) Sherian Cadoria. General Rogers at that time was the DESPER at USAREUR, responsible for all military and civilian personnel activities, a position he held until he left the Army to pursue theological studies. He recalled in detail the selection of Gibson's replacement, as he felt the candidates were all well-qualified for the position. When she sat on the review Panel, General Cadoria was the Chief of Physical Security Division at USAREUR, the first woman to hold this position.

Both General Cadoria and General Rogers testified about the Review Panel's rating procedures, which were established before the review began. Candidates' packages were randomly assigned to members for review and there was no indication that the Panel members discussed the candidates prior to their individual review, or that ratings were changed following discussion. Each candidate was reviewed separately by four Panel members, on the basis of a spread-sheet summary of experience, and portions of their SKAP Package.

Plaintiff challenges the accuracy of the spread-sheet's summary of her qualifications, and contends that her experience was significantly undervalued. A comparison of the SKAP packages of Troughten, Santiful and Judge with the spread-sheet reveals minor errors in the summary of each of their qualifications. The Court did not have the SKAP packages of the other candidates before it, and could not determine whether their qualifications were accurately reflected. The inaccuracies were minor, for all three candidates, and there was no evidence that any bias or discriminatory animus produced or contributed to the inaccuracies. Indeed, General Rogers testified that the spread-sheet had been provided and prepared by the Panel recorder, not a Panel member. The Court cannot see any basis for inferring that this summary injected an element of discrimination into the process.

The top three candidates were Anita Gomez Troughten (147 points), Luther Santiful (133 points) and Rosabelle Judge (131 points). A comparison of the candidates' overall ratings on their SKAP Qualification Assessment forms reveals that Ms. Troughten had eight As and 21 Bs, Mr. Santiful had all Bs, and Ms. Judge had 23

---

5. The list also included Patsy Moore, whose name was added on November 26, 1980, nearly three weeks after the list was sent. Plaintiff challenges Ms. Moore's inclusion, claiming that her SKAP rating was done out of the ordinary cycle, in order to make her eligible for consideration. This special type of rating was never done for black women, according to plaintiff. The evidence did not show, however, that the timing of Ms. Moore's rating was unusual, or that there was any statistical demographic disparity in similarly-timed ratings. Further, since Ms. Moore was not either recommended or selected for the position, her inclusion does not evidence any disparate treatment of plaintiff, who was already on the referral list for GS–14 EEO Officer positions.

Bs and five Cs.[6] The candidates had comparable experience in EEO and/or Equal Opportunity ("EO"), which involved similar non-employment issues within the military. The summary reflected that Ms. Judge had over six years staff level experience in EEO Programs and total EEO Program time. Ms. Troughten had only a little over one year of staff level experience in EEO Programs, with total EEO Program time of nearly 10 years. Mr. Santiful had total EEO Program time of nine years, two years of which were staff level experience.

There was no independent evidence that the sex and race of a candidate played a role in the ratings. Further, the Court credits General Cadoria's assessment that race and sex played no role in the selection process. General Cadoria recognizes the difficulties that black women experience in career advancement in the Army, and expressed her opinion that often black women must work harder to achieve career goals. Nonetheless, she testified very clearly that the Panel's selection of Troughten and Santiful, and their ratings of all candidates were not based on race or sex. Once the top candidates were selected, their names and ranking were forwarded to General Kroesen. After interviewing Troughten, Santiful and Judge, General Kroesen accepted the Panel's recommendation, and offered Ms. Troughten the position.

After Ms. Troughten refused the position, General Rogers urged General Kroesen to select Luther Santiful, as he had been ranked in second place. General Rogers summarized this advice in a letter to General Kroesen, and subsequently sent General Kroesen a note urging selection of Santiful and reporting remarks made to him by General Becton. The remarks were not favorable to Ms. Judge, and Rogers requested General Kroesen to destroy the note, which he did not do.

In spite of Rogers' urgings, General Kroesen decided to reconvene the Review Panel, as he felt that their ratings might change without Ms. Troughten's materials before them. Each Panel member reviewed the candidates at the second convening, and Santiful was ranked first, twenty points ahead of Ms. Judge. General Kroesen again accepted the Panel's recommendation and offered Santiful the position. He testified that he based his selection in both instances on the records, interviews, and recommendations of the candidates. There was no direct evidence that, prior to selecting Mr. Santiful, General Kroesen knew of plaintiff's EEO complaint filed in connection with the original selection of Ms. Troughten, or that he knew of her prior EEO complaints.

During approximately the same time frame, Ms. Judge was being considered by a separate reviewing panel, chaired by Sam Schwartz, for the position of Federal Women's Program Manager at Department of Army Headquarters in this country, GS–14 level. The principal duties of this position are to evaluate and monitor women's EEO programs throughout the Army, and to coordinate policy goals with other EEO programs. The other Panel members were Rosemary Howard and John Nelson. As there were only three candidates for the position, June Hajjur, Rita Braxton and plaintiff, the Panel members interviewed them all, using questions formulated in advance. Schwartz knew that plaintiff had filed an EEO complaint concerning her non-selection. One of Schwartz's staff, Cheryl Goffer, testified that Schwartz said he would not hire plaintiff because he considered her to be a "troublemaker."[7] Schwartz apparently did not share either this information or his opinion of plaintiff with the Panel members. Ms. Howard testified that the candidates' qualifications were discussed among the panel members,

---

6. Plaintiff received no rating for item 26 "Effectiveness in Dealing with Unions." Both Troughten and Santiful received Bs in this element. No rating for this item was necessary for the position of EEO Officer.

7. Ms. Goffer apparently had a very acrimonious working relationship with Mr. Schwartz, which was evident at trial, even though Schwartz had left in 1982 when his position was abolished by re-organization, and has not spoken with her since.

but that there was no mention of race, sex or protected EEO activities of any candidate. June Hajjur, the selectee, was ranked the highest by the Panel, and Ms. Judge was ranked third.

The Panel evaluated the candidates on the basis of their experience, qualifications and the interview. Hajjur and Judge were comparably qualified, but the impression they made at the interview was markedly different. Ms. Hajjur provided the Panel with specific examples of work she performed,[8] and drew on her experience in policy formulation as FWP Manager at the Marine Corps and Department of State in responding to the questions. Ms. Judge drew primarily on her experience in Europe, and responded to some questions simply by referring the Panel members to her materials. Plaintiff's interview was characterized as "good, but not excellent." On the other hand, both Schwartz and Rosemary Howard testified that they were impressed with Ms. Hajjur's breadth of experience, and with her responses at the interview.

Based on the results of the Panel's review, Mr. Schwartz selected June Hajjur. Administrative review of the complaint plaintiff filed concerning the 1981 non-selections resulted in findings of no discrimination or reprisal.

### C. The 1983 Complaint—Merit Pay Performance Appraisal

In September, 1982 General Kroesen approved the "highly successful" Merit Pay Performance Appraisal rating Luther Santiful gave plaintiff for the rating period July 1981 to June 30, 1982. Plaintiff contends that her supervising officers' failure to rate her "exceptional" was in retaliation for her EEO actions.

The Merit Performance System determines the level of pay increase an employee should receive, based on the quality of his or her performance during the applicable rating period. Before October, 1980, the system applied three ratings, with "Outstanding" being the highest. Plaintiff's supervisors rated her "Outstanding" from 1975 to 1980. In October, 1980, a new five-tier system of merit pay ratings was established. The highest three final ratings, in descending order, were: (1) Exceptional, (2) Highly Successful, and (3) Fully Successful. These final ratings were based on ratings of prescribed merit elements. The major merit elements were broken down into categories of "critical" and "non-critical" elements. An employee was rated for each element as having either "met" or "exceeded" the substantive element requirements. Ratings were assigned by the employee's immediate supervisor, and then signed by the supervisor and employee. The signed ratings were forwarded to the approving official for his signature. General Kroesen, who served as plaintiff's merit pay approving official, testified that his signature indicated only his opinion that the rating supervisor had fulfilled his responsibility in evaluating and rating the employee in accordance with the Merit Pay guidelines. Unlike the SKAP ratings, General Kroesen did not have to independently rate plaintiff.

Rating for the first period under these new standards, October 1, 1980 to June 30, 1981, was done in early September, 1981. Santiful rated Ms. Judge "Highly Successful," based on ratings of "exceeded" for seven major elements, and one "met," in a non-critical element. Mr. Santiful had only been plaintiff's supervisor for one and a half months of this first rating period, and

---

**8.** Ms. Hajjur prepared and brought to the interview notebooks summarizing and highlighting her experience and qualifications. Plaintiff points to this as evidence of discriminatory treatment, but the facts at trial revealed only that Ms. Hajjur, without encouragement or suggestion, compiled the materials herself to have the best possible chance at getting the position. While consideration of materials outside those required by regulation may have created a pro-

cedural defect in the interviewing process, there was no evidence that the materials were requested, prepared, presented, or considered because of any discriminatory or retaliatory animus. The selection process in the Army strives for, but does not always achieve, objectivity. Its shortcomings, however, are not necessarily due to and do not necessarily reflect unlawful discrimination or retaliation.

was not as familiar with her work in certain rating areas. To get more input, Santiful discussed the ratings with General Kroesen. Santiful's initial rating assigned plaintiff "met" in four criteria. When plaintiff was shown her initial ratings, she objected strenuously. After discussing the ratings with her, Santiful raised three of the "met" ratings to "exceeded." Both Santiful and Judge then signed the form, and it was forwarded to General Kroesen. When he saw that several element ratings had been changed, General Kroesen called Santiful. After Mr. Santiful explained that he based the increases on his conversation with plaintiff, General Kroesen approved the rating.[9]

In the next rating period, plaintiff again was rated "Highly Successful," based on ratings of "exceeded" in seven major elements, and "met" in two: # 3 "Acts as USAREUR EEO Officer in absence of incumbent" and # 9 "Prepares and presents Affirmative Action Program briefings." Mr. Santiful testified that he had received complaints from several individuals that during his absences plaintiff had not given them requested information and that she was difficult to deal with at times. One of these individuals was Leo Franklin, EEOO in USAREUR, Heidelberg since 1980, who has frequent professional contact with Ms. Judge. Although they now apparently have a good working relationship, during the period in question Franklin testified that he found her to be autocratic and abrasive in response to his routine inquiries. As a result, if Santiful were not available, Franklin would defer handling matters rather than contact Ms. Judge. He complained of this to Santiful before the June 1982 ratings were done. Whatever justification Franklin and Judge had for the professional stances they maintained toward one another at this time, Mr. Santiful was justified in considering the complaints when assessing Ms. Judge's performance. At one point, staff also reported to Santiful an argument plaintiff allegedly had with an officer over the allocation of space in the offices. Santiful did not receive any complaints about the technical competence of plaintiff's general performance, but the other complaints, and what Santiful described as plaintiff's sometimes "inappropriate" behavior in her contact with others, prompted him to rate her "met" for element # 3.

Santiful's rating for element # 9 was based principally on his observation of Ms. Judge's presentations at Affirmative Action Briefings. Although the informational aspect of plaintiff's briefings was thorough and accurate, Santiful based his ratings as well on reports from the Panel, which suggested plaintiff's performance was stilted. Mr. Santiful also testified that he felt plaintiff had at one point in a briefing inappropriately challenged the accuracy of figures during another briefer's presentation. Although Santiful had rated plaintiff "exceeded" for this element for the first rating period, based upon his opportunity to observe plaintiff's briefing preparation and presentation, and the reports he received, he testified that he felt a rating of "met" was more appropriate in September of 1982. Santiful again discussed his rating with General Kroesen and with plaintiff before finalizing them.

Ms. Judge disagreed with this round of ratings as well. She met with General Kroesen to explain that the ratings were unjustified, and did not reflect her performance. General Kroesen described this interview as a "diatribe" about Luther Santiful, but heard plaintiff out and suggested she provide him with written information to support increasing the ratings. Kroesen and the CPO reviewed plaintiff's materials and independently concluded that no increase was merited. Plaintiff received Merit Pay based on a "Highly Successful" rating, and filed an EEO complaint in November 1982 alleging reprisal and discrimination.[10]

---

9. Plaintiff did not file an EEO complaint regarding this rating although it was given after she had filed her earlier EEO complaints concerning her non-selections and SKAP ratings.

10. Plaintiff is only pursuing a claim of reprisal with regard to the 1982 Merit Pay rating.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

The framework for analyzing the evidence in a Title VII case begins with an evaluation of plaintiff's *prima facie* case. The elements of a *prima facie* case vary depending on whether the case involves a failure to hire, failure to promote, or retaliation. *E.g., McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Plaintiff's initial burden is a relatively easy one to meet, and is intended to eliminate the most common non-discriminatory reasons for defendant's actions, "lack of adequate qualifications and lack of job opportunity." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *Garner v. Boorstin*, 690 F.2d 1034, 1036 (D.C. Cir.1982).

▬▬▬ Once a *prima facie* case is established, the burden of proof shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. To meet this burden, the defendant must clearly set forth through admissible evidence a reason for the action which raises a genuine question of fact. *McKenna v. Weinberger*, 729 F.2d 783, 788 (D.C.Cir.1984). Once the defendant has done so, the burden returns to the plaintiff to show that the proffered reasons are a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. At this point the ultimate factual issue of whether defendant intentionally discriminated against the plaintiff is before the Court. *E.g.*

*Dougherty v. Barry*, 607 F.Supp. 1271, 1281 (D.D.C.1985). Throughout the proceedings:

'The plaintiff retains the burden of persuasion. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.' 450 U.S. at 256. In short the district court must decide which party's explanation of the employer's motivation it believes.

*United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

### A. Discriminatory 1977 SKAP Rating And Non-Promotion

To establish a *prima facie* case of discrimination in her SKAP ratings and non-promotion, Ms. Judge must demonstrate that (1) she belongs to a protected group, (2) she was qualified to receive the desired rating and promotion, (3) she was considered for and desired the rating and promotion, and (4) other employees of similar qualifications who were not members of the protected group were promoted and so rated during the relevant time frame. *See, McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981).

The protected group upon which plaintiff's claims are based is that of black women.[11] Disparate treatment of subclasses of women, based on an immutable characteristic or the exercise of a fundamental right, has been held unlawful under Title

---

**11.** Plaintiff's complaint and post-trial brief are somewhat ambiguous on the protected status asserted in this action. If the protected group is defined as either race or sex alone, plaintiff would not have been able to establish a *prima facie* case of discrimination in the 1977 SKAP rating or the 1981 selection of Gibson's successor EEOO at USAREUR. The 1977 DA Screening Panel rated six of the nine eligible black men and all three of the eligible white women HQ. Plaintiff's claims of discriminatory prac-

tices during the evaluation allege abuses in favor of both black men and white women and thus would not provide an independent claim based solely on race or sex.

Similarly, of the seven available candidates for USAREUR EEOO in 1981, General Kroesen first selected a woman. When she declined, he accepted a black. Thus, under *McDonnell Douglas*, plaintiff has not made a *prima facie* case of discrimination for either action, based on her status as a black or as a woman.

VII. *E.g. Abraham v. Graphic Arts International Union*, 660 F.2d 811 (D.C.Cir. 1981) (leave policy did not accommodate pregnancy and hence was unlawful gender discrimination under Title VII); *Jeffries v. Ham's County Community Action Association*, 615 F.2d 1025, 1033–34 (5th Cir. 1980). Extrapolating from such "sex-plus" cases, the Fifth Circuit has determined that black women are a distinct subgroup, protected by Title VII. *Jeffries*, 615 F.2d at 1034. This outcome is logical: while accepted "sex-plus" discrimination is based on ostensibly neutral factors, both factors allegedly involved in the present case are separately accorded Title VII protection. Race discrimination directed solely at women is not less invidious because of its specificity. Thus, the Court concludes that employment actions directed against black women as a group may violate Title VII.

■ The difficulty with this position is that it turns employment discrimination into a many-headed Hydra, impossible to contain within Title VII's prohibition. Following the *Jeffries* rationale to its extreme, protected subgroups would exist for every possible combination of race, color, sex, national origin and religion. It is questionable whether any employer could make an employment decision under such a regime without incurring a volley of discrimination charges. For this reason, the *Jeffries* analysis is appropriately limited to employment decisions based on one protected, immutable trait or fundamental right, which are directed against individuals sharing a second protected, immutable characteristic. *See Jeffries*, 615 F.2d at 1033–34 (discussing subclass limitations under Title VII). The benefits of Title VII thus will not be splintered beyond use and recognition; nor will they be constricted and unable to reach discrimination based on the existing unlawful criteria. Further, recognition of a new subgroup does not alter the employer's burden in a disparate treatment case. The employer still need establish merely a legitimate, non-pretextual basis for the employment decision. *E.g. Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. Plaintiff herein retains the burden, difficult though it may be, of establishing by a preponderance of the evidence that her employer's challenged decisions were based on this narrowly defined subgroup. *E.g., McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

■ Plaintiff has shown the other elements of a prima facie case of discrimination in the 1977 SKAP ratings and EEOO promotion decision. The rating and promotion system both employ subjective criteria, and there is evidence that the rating system guidelines are not rigidly applied. Plaintiff introduced evidence which established that she met the minimum qualifications for promotion to EEOO, and that she was within the general, objective range of employees who were given a rating of HQ.

Defendant offered legitimate business reasons for both decisions, however, and plaintiff has failed to show that the reasons are pretextual. Plaintiff was not rated HQ, because she received a rating of "C" in element 3. The statistics plaintiff introduced to buttress her claim that discrimination more likely than not contributed to her rating, are of questionable value. The only expert testimony offered to interpret the statistics was presented by defendant, through Charles R. Mann, Ph.D., a statistician familiar with EEO analysis and guidelines. Although plaintiff attempted to show that women, especially black women, were inadequately represented at the higher grade levels of Army careerists, Dr. Mann testified that the statistics showed no statistically significant difference in distribution at GS–14 levels and above. In addition, the generally small sample size and lack of historical data further undermined the evidentiary value of the statistics.

■ Plaintiff claims that the SKAP Panels engaged in "trade-offs" of element ratings, and that this practice undermines the legitimacy of defendant's reliance on her element 3 "C" rating as the reason for not rating her HQ. The "trade offs" involved the Panel's admitted practice of defining grade elements in the crediting plan. For example, the 1977 plan for promotion to a

GS–14 EEO Officer position required a "B" in element 3. "B" was defined as "generally ... not more than one C in this element grouping." Pl.Exh. 16. Plaintiff has not established that her C rating was assigned discriminatorily, nor that the Panel's adherence to the established crediting plan was discriminatory. A "B" rating in element 3 was required for an overall HQ rating, and not one of the eight careerists rated in 1977 who had "Cs" or lower in element 3 received an overall rating of HQ. Further, Ms. Judge admittedly failed to submit additional documentation to the rating panel, which precluded her from reconsideration for a higher rating. The preponderance of the evidence adduced at trial does not show that the panel's 1977 assignment of a "C" in element 3, or its overall rating of "Q" were based on illegitimate, discriminatory factors.

■ Failure to select Ms. Judge as EEO Officer was also not based on her status as a black woman. The testimony at trial did not reveal any unlawful discrimination at either level of the two-tiered decision-making process. General Cadoria indicated that the applicants' records were evaluated as a whole.[12] General Rogers testified that, in ranking the top three applicants, he reviewed each applicant's record as a whole, and gave weight to the fact that both Anita Gomez Troughten and Luther Santiful were EEO Officers at the time, while Ms. Judge was an assistant EEO Officer. Further, Ms. Judge's SKAP rating sheet had five Cs and no As, while neither Santiful nor Troughten had any ratings lower than B. General Kroesen accepted the Review Panel's recommendations. The respect General Kroesen accorded the selection process is further evidenced by his decision to reconvene the Review Panel once Anita Troughten declined the EEO Officer position.

■ Without doubt, the decisions of the evaluation panel members in ranking the applicants, and General Kroesen in twice relying upon the panel reflect subjective choices. Although the Court is sensitive to the possibility that subjective criteria in a hiring or promotion process may produce discrimination, it recognizes that such criteria "are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about hiring and promotion in supervising and managerial jobs cannot realistically be made using objective standards alone." *Davis v. Califano,* 613 F.2d 957, 965 (D.C. Cir.1979). *See also Law v. Greyhound Lines, Inc.,* 486 F.Supp. 1343, 1347 (S.D.Ga. 1980). The employer's judgment in selecting and applying subjective criteria may be poor, and it may be erroneous, but the only relevant inquiry for the Court is whether the given reasons mask unlawful discrimination. *See Clay v. Hyatt Regency Hotel,* 724 F.2d 721, 725 (8th Cir.1984); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 (1st Cir. 1979). The steps in the evaluation and selection process of EEO Officer reflected only the subjectivity inherent in employment decisions. The preponderance of the evidence does not reveal that plaintiff's status as a black woman was a factor in her ranking or her non-selection. Thus, the Court finds that plaintiff has not met the ultimate burden of showing by a preponderance that her 1977 SKAP Rating or her non-selection were based on her race and sex.

### B. *Retaliation Claims*

■ Ms. Judge also claims that her non-selection for the Federal Women's Program Manager position and the EEO Officer position, and her rating of only "Highly Successful" on a Merit Pay Performance Appraisal were in retaliation for her filing of EEO discrimination complaints. The

---

**12.** General Cadoria, a highly credible witness, testified at length about the evaluation panel process. While the promotion process invariably admits of subjectivity, General Cadoria's testimony about the independence of the individual reviewers in this instance, and the sub-

stantial degree of objectivity they employed, mitigates the Court's concerns that the process was unduly or unfairly subjective. To the greatest degree possible, the reviewers objectively compared and ranked the applicants.

*prima facie* case of retaliation is drawn from the *McDonnell Douglas* framework, and plaintiff need only show "1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984). Ms. Judge has established a *prima facie* case of retaliation in her three claims. Plaintiff sought EEO counselling and filed an EEO complaint, both of which are protected activities. *See, e.g., McKenna*, 729 F.2d at 790–91 n. 54; § 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). Schwartz and Kroesen clearly knew of her prior EEO complaints at the time of the Merit Pay rating and selection of FWP Manager. Although the evidence is not unequivocal, it is reasonable to infer that General Kroesen knew that plaintiff had sought EEO counselling at the time he selected Santiful as EEO Officer in April 1981. An employer's knowledge of an employee's involvement in the EEO administrative process is enough to show a causal connection, for purposes of a *prima facie* case. *E.g., McKenna*, 729 F.2d at 791. Thus, the Court finds that a causal connection, albeit tenuous, existed when all three employment actions were taken.

■ As a legitimate, non-discriminatory reason for plaintiff's non-selection as EEO Officer and FWP Manager, defendant submits that the ultimate decision was based on rank-ordering of candidates by a review panel, and that the review panels based their ratings on the candidates' qualifications, not on their history of filing EEO complaints. As discussed above, the preponderance of the evidence does not reveal that the EEO Officer review panel considered anything other than the qualifications of the candidates when assigning their ratings. General Kroesen's decision to accept Luther Santiful as the selectee was not shown to be retaliatory. The Court credits General Kroesen's testimony that he relied primarily on the Panel's recommendation when he selected Santiful. General Kroesen convened the first Panel when plaintiff was only one of seven candidates, before she had filed an EEO complaint. He relied on the Panel's recommendation when he first offered the position to Ms. Troughten, and decided to reconvene the Panel over General Rogers' objections when Ms. Troughten declined. In light of this evidence, Ms. Judge's claim that Kroesen's reliance on the Panel was pretextual is not persuasive.

■ Similarly, plaintiff has not shown by a preponderance of the evidence that Schwartz's stated assessment of Ms. Hajjur's qualifications and interview were a pretext for retaliatory non-selection of plaintiff. Although plaintiff takes issue with the Panel's conclusions about the comparative worth of her own and Ms. Hajjur's experience, the conclusions appear to the Court to have been based on the Panel's objective assessment of what personal and professional qualities would best meet the needs of the FWP Manager position. Ms. Hajjur presented greater experience with policy formulation, and her background revealed Stateside experience in inter-agency policy coordination. Ms. Judge, while presenting an impressive background, was weaker in both areas. The concerns the Panel had with these deficiencies were not alleviated by their interview of Ms. Judge. Both criteria are related to the position, and successfully rebut plaintiff's *prima facie* case of retaliatory non-selection. *See Davis*, 613 F.2d at 965; *Cintron v. Adams*, 458 F.Supp. 43, 59 (D.D.C.1978). Further, there is no evidence that the Review Panel, with the exception of Mr. Schwartz, knew of Ms. Judge's protected EEO activities. The focus of the Panel was on the experience and qualifications of the applicants, and absent further evidence that protected activities played a role in their decision or in Schwartz's ultimate selection the Court cannot find that plaintiff has met her burden of showing by a preponderance that her non-selection was retaliatory.

■ Turning to the final claim of retaliation, the Court finds that plaintiff has established a *prima facie* case of retaliation in the assignment of her Merit Pay

ratings in September 1982. Both individuals who signed plaintiff's review form and conferred about her ratings had knowledge of her EEO complaints. Indeed, General Kroesen who approved the ratings was the alleged discriminating official in one charge. Plaintiff challenged therein the selection of Luther Santiful as EEO Officer, and it was Santiful who gave her the Merit Pay rating. In light of the nearly uniform praise accorded plaintiff's technical abilities, and her record of receiving high Merit Pay ratings in the past, an inference could be drawn that the "highly successful" rating she received in 1982 was in reprisal for her EEO charges.

 Nonetheless, the Court finds that the legitimate reasons defendant articulated were not shown to be pretextual by a preponderance of the evidence. Mr. Santiful's ratings were based on admittedly subjective criteria, and plaintiff vehemently disagrees with his conclusions. As stated above, because the criteria are subjective the Court must scrutinize—not reject—them. *E.g., Davis*, 613 F.2d at 957. Although plaintiff challenged the basis for the complaints, and questioned Santiful's credibility, independent evidence persuades the Court that complaints were made to Santiful about the manner in which plaintiff performed her job. There was no evidence that Santiful encouraged or unduly credited the complaints that were made. Plaintiff's suggestion that her abrasiveness and the reported complaints are a recent fabrication is further discredited by the testimony of her friend and former supervisor William Gibson: while it was clear to the Court that Gibson holds plaintiff in the highest esteem as an individual and an employee, he recognized that she could be difficult to deal with, and testified that he also had received complaints about her. These complaints did not keep him from giving plaintiff the highest Merit Pay rating.

In scrutinizing Santiful's decision to rate plaintiff, however, the Court must focus on his motivation, not on his business judgment. *E.g., Loeb*, 600 F.2d at 1012 n. 6.

Santiful's decision was made based on the complaints he received, and the propriety of his conclusion that the sum of plaintiff's personal and professional characteristics merited a rating of "Highly Successful" is not before the Court's review, once it determines that retaliation was not a factor. Santiful's ratings do not appear unreasonable or pretextual, and plaintiff presented no evidence to suggest that his evaluation of her abilities was based on factors other than his perception of her performance. Mr. Santiful was entitled to make his own business judgments, as long as they were not pretextual. *Id.* The Court concludes that Santiful exercised this judgment in a non-retaliatory fashion in assigning plaintiff her Merit Pay ratings.

In an effort to discredit the ultimate rating she received, plaintiff introduced testimony of other employees who spoke highly of her, personally and professionally. The Court reiterates that it does not doubt that plaintiff is a dedicated and highly capable individual. The other elements—critical and non-critical—of her Merit Pay rating reflect this level of performance. Such evidence does not counter the evidence that individuals other than Santiful found Ms. Judge difficult to interact with professionally. Viewing the evidence as a whole, the Court finds that it does not demonstrate by a preponderance that retaliation was a factor in Santiful's rating of plaintiff. Accordingly, the Court concludes that plaintiff has not established her claim for retaliation in the Merit Pay rating.

The Court is satisfied that General Kroesen's concurrence in Santiful's rating of plaintiff was objective, and was not based on Kroesen's reaction to plaintiff's EEO complaints. General Kroesen had a limited role in the Merit Pay evaluation of plaintiff, and appears to have concurred in plaintiff's supervisor's ratings, just as he had done before any EEO complaints were filed. Additionally the Court notes that Kroesen rated Santiful "Highly Successful" for the same period, even though Santiful, just like Judge, exceeded the standard

for each of his critical job elements. Kroesen thus appears to the Court to have acted objectively and consistently when he approved Judge's rating of "Highly Successful." [13] The Court concludes that plaintiff has failed to show retaliation in any of her claims by a preponderance of the evidence.

An order consistent with the foregoing conclusions accompanies this opinion.

### ORDER

In accordance with the accompanying opinion, it is this 11th day of December, 1986,

ORDERED that judgment is hereby entered in defendant's favor on all claims in the above action. This case is dismissed in its entirety with prejudice.

---

**13.** At trial, plaintiff attempted to establish that Kroesen had a discriminatory attitude towards women in general, and towards plaintiff in particular. The aggregation of data proffered by plaintiff in this regard is incompetent as statistical evidence. The non-statistical evidence was equivocal, at best, and was not sufficient to dispel the Court's impression of Kroesen as a candid and credible individual.