Jackie **MONROE**, Plaintiff,

v.

**GUARDSMARK, INC.,** Defendant.

No. TX 85–4100.

United States District Court,
W.D. Arkansas,
Texarkana Division.

May 7, 1987.

Chad Farris, Youngdahl, Youngdahl & Wright, P.A., Little Rock, Ark., for plaintiff.

Jerry C. Jones, and Jim Hunter Birch, of Rose Law Firm, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, District Judge.

Plaintiff Jackie Monroe is a black male and a former employee of the defendant, Guardsmark, Inc. Plaintiff brings this action pursuant to 42 U.S.C. Section 1981 and 42 U.S.C. Sections 2000e et seq. The complaint alleges that plaintiff's discharge from employment with Guardsmark was on the basis of race and this action was filed seeking monetary damages, injunctive and declaratory relief and reinstatement to redress defendant's alleged discriminatory employment practices. Jurisdiction of this case is pursuant to 28 U.S.C. Section 1343.

Trial of this action, to the Court, commenced on January 28, 1987. It was tried to a completion in two days and at the conclusion of the trial the Court orally pronounced its ruling from the bench in favor of the defendant Guardsmark. The Court has since received defendant's proposed Findings of Fact and Conclusions of Law and Judgment from the defendant and is prepared to enter its formal Opinion and Judgment. The Court incorporates herein findings of fact and conclusions of law pursuant to Rule 52, Fed.Rules of Civ.Pro.

The plaintiff, Jackie Monroe, is a black, male citizen of the United States currently residing in Ogden, Arkansas.

The defendant is Guardsmark, Inc. (Guardsmark), a Delaware corporation licensed to do business in Arkansas, with its principal place of business in Memphis, Tenn. The Guardsmark operations in Ashdown provided security and maintenance services for Nekoosa Papers, Inc. of Ashdown.

Jackie Monroe is a college graduate with a Bachelor of Arts degree in history. Prior to his employment at Nekoosa Mr. Monroe worked as a substitute teacher in the Ashdown School District and part-time at the J.B. Davis General Store in Ashdown. Mr. Monroe was hired by Guardsmark as a security guard on June 8, 1982. He completed an orientation and training period and was assigned to a security guard position in the Nekoosa plant at Ashdown.

During the time period Monroe was employed by Guardsmark, Guardsmark maintained in its personnel files a system of index cards and notes which recorded the attendance of employees and disciplinary violations. At trial the parties submitted Joint Exhibit 7 as the file containing copies of such disciplinary notations and attendance cards of Guardsmark employees during 1982 and 1983. Jackie Monroe was discharged by defendant on October 26, 1982, for failure to follow orders.

On or about December 14, 1982, plaintiff filed a charge of race discrimination against Guardsmark with the Equal Employment Opportunity Commission ("EEOC"). On or about September 11, 1984 the EEOC issued a determination of having found reasonable cause to believe Mr. Monroe's charge was true. Conciliation attempts were unsuccessful and a Right to Sue letter was issued to plaintiff on August 6, 1985. Plaintiff thereafter filed this action on September 6, 1985.

Plaintiff contends that defendant's decision to discharge him on October 26, 1982, was racially discriminatory. Defendant asserts that plaintiff's discharge was for fail-

ure to follow orders and that plaintiff's race played no part in the decision.

Plaintiff testified that he was subjected to harassment and racially derogatory language by white supervisory employees of the defendant. Testimony was offered from other employees and former employees of Guardsmark in support of plaintiff's claim of disparate treatment of blacks by the defendant. Specifically, plaintiff contends that other white security guards employed by Guardsmark violated the same rules and regulations as he and other black security guards had violated but the white employees were not disciplined as the black employees were.

During plaintiff's training with Guardsmark he received a copy of Guardsmark's General Orders, Rules and Instructions. Plaintiff was instructed as to such rules and regulations he was required to follow as it was with every security employee.

In the file containing copies of the disciplinary and attendance cards of Guardsmark employees during 1982 and 1983 (Joint Exhibit 7) there is noted a series of incidents which took place during the four and one-half months plaintiff was employed by defendant as follows:

(A) "Jackie Monroe called out, had it charged to 898–3808, at 12:30, he told me." This notation was signed by W.M. Smith;

(B) "Jackie Monroe was found in finishing computer office making outside phone calls. This makes the second time that he has been found in there instead of being on his post. Time found about 1:15 a.m., 7–19–82." Signed Sgt. Gene Mathis.

(C) An entry on 6–25–82 states, "Was instructed by Sgt. McCoy to return to Mill Patrol Post 10 at 5:10 a.m. He came in to clock out to fill out his daily report, waited for 6 a.m. shift change."

(D) On 6–27–82, an entry states, "Called in sick, face infected."

(E) On 7–19–82, there is an entry that Plaintiff was caught in the office of the computer room making a personal phone call by Sgt. Mathis at approximately 1:15. Monroe had the call charged to 898–3803

according to Mrs. W. Smith, post guard duty."

(F) On August 2, 1982, the file contains a notation that Plaintiff was discovered by Sgt. Mathis on a third time "kicked back at the finishing department computer room desk."

(G) On August 2, 1982, Plaintiff Monroe was observed by Sgt. Dagenhart using the telephone in the No. 63 Paper Machine Control Room at 9:00. Monroe hung up the phone before Ms. Dagenhart reached him but in checking the call and log, the call was not for official business. He listed his 9:00 call from the fork lift on extension 257. According to the notation, three janitors were also in the room with him at the time. The notation contains a further comment that Plaintiff Monroe was observed by a G. Merrell entering the finishing department computer room at 11:10, however, he did not call in from there. Sgt. Dagenhart does not know how long Mr. Monroe remained in that room.

(H) On August 3, 1982, Plaintiff Monroe was observed sitting at a desk in the computer room/finishing department by Sgt. Mathis.

(I) On August 6, 1982, was caught with his eyes closed sitting in the No. 63 Paper Machine Control Room. The notation observed Mr. Monroe for three minutes before he opened his eyes: "I observed Mr. Monroe from 3:16 until 3:19 p.m., at this time he opened his eyes and saw me looking through the door at him. He got up, came out, and said he was sorry. I asked him if he knew the penalty for his infraction. He said, yes, I can be fired. I did not suspend Mr. Monroe for this, however, I gave him a verbal warning that he would be suspended for any future infraction of the rules. Mr. Monroe is working a double because of personnel shortages."

(I) On 8–5–82, Monroe was counselled about making required call in.

(J) On 9–29–82, Mr. Monroe was insubordinate with his field officer during his routine shift. This notation is initialed JB.

Testimony from the parties at trial centered on two particular incidents which occurred near the time of plaintiff's discharge.

The first incident involved an altercation between plaintiff and one of his supervisors on September 29, 1982. Both plaintiff and Sgt. Terrence J. Humphrey testified about the incident and recited different versions of what occurred. Plaintiff was at his duty station when he was approached by Sgt. Humphrey and a confrontation ensued. Plaintiff testified that Humphrey called him "boy" and "nigger." He stated that Humphrey was standing over him "with (his) finger in (his) face" and "shouting racial slurs" at him. Plaintiff then stated he got up from his chair, shoved Humphrey and ran out the door of the guard's building, headed for the main gate. However, Sgt. Humphrey testified that he did not call plaintiff a "nigger" or direct any other racial or derogatory remarks toward him. Humphrey stated that when he requested plaintiff to sign a report plaintiff refused and then grabbed Humphrey and shoved him backward. Plaintiff then ran out the door. Mr. Jim Bush, Guardsmark Unit Manager, was contacted by another Guardsmark employee concerning the matter and conducted an investigation. Mr. Bush testified at trial that he interviewed Mr. Monroe and Sgt. Humphrey indepth concerning the incident. Bush's testimony again revealed how very different the two versions of the incident were. Unable to confirm the credibility of either version Mr. Bush gave the plaintiff and Sgt. Humphrey a five-day disciplinary suspension.

The final event which led to plaintiff's discharge occurred on or about October 23, 1982. It was revealed through testimony and evidence presented at trial that defendant Guardsmark had a rule or regulation which prohibited an on-duty guard from having his lunch brought to him by anyone, including off duty guards, while he was on duty. The lunch must be left at a designated gate for the guard to come and pick up on a break or the lunch could be delivered to a guard on post by the sergeant or at the sergeant's direction. As testimony indicated all employees, including plaintiff, were well aware of this policy.

On October 23, 1982, Sergeant Joan Fleming and Sergeant Trainee Cynthia Honeycutt discovered Dorothy Pree, an off-duty guard at plaintiff's post. Ms. Pree had brought plaintiff's lunch to him at his post in violation of company policy. Ms. Fleming and Ms. Honeycutt both submitted written reports on the incident to Mr. Bush. After a review of the reports Mr. Bush terminated plaintiff on October 26, 1982, for failure to follow orders.

Several witnesses testified that they and other employees, both white and black, ignored or violated the company's policy in the same manner as plaintiff and Ms. Pree. Mr. Bush testified that he was aware of this problem with violations of policy. However, he stated that he acted on every incident where a violation of the rules was established through accurate information and documentation. Bush stated that he did not base disciplinary action against employees on rumors, hearsay or speculation. As a result of Mr. Bush's investigation of the October 23 incident both plaintiff Monroe and Ms. Pree were discharged.

During the course of the trial the EEOC investigatory file on plaintiff's charge was admitted as plaintiff's exhibit no. 1. Included in this file is a document listing the terminations by Guardsmark at the Nekoosa Papers plant between July 1, 1982 and January 31, 1983. This document cited the following terminations during the relevant time period: Jenifer Abner, black, terminated August 30, 1982, for violating company policy; Emma D. Berry, black, terminated October 22, 1982 for falsifying records in violation of company policy; Ray Boone, white, terminated January 13, 1983 for violation of company policy; Shirley Burges, black, terminated for failure to follow orders; Dina Compton, black, terminated for leaving her post without proper leave or authorization; Vicky Cox, black, terminated for attendance problems; Georgia Fields, black, terminated for leaving her post without proper leave or authorization; Arthur Gunn, white, terminated for leaving his post without proper leave or authoriza-

tion; Cynthia Honeycutt, white, terminated for failure to follow instructions; Arthur Jackson, black, terminated for attendance problems; Dorothy Lockaby, white, terminated for failure to follow orders; Paula Mason, white, terminated for falsifying records; Adolph Miller, black, terminated for falsifying records; Jackie Monroe, black, terminated for failure to follow orders; Dorothy Pree, black, terminated for failure to follow orders; Doyle Porter, white, terminated for insubordination and conduct unbecoming a security officer; Loretta Rowell, white, (reason for termination not shown on exhibit).

■ After careful review of the facts developed by the testimony and evidence the Court now turns its attention to the law applicable to the case. It is well established that in order to prevail on a charge of racial discrimination plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff is required to establish the following elements to meet the initial burden of proof:

(1) he belongs to a protected group;

(2) he was qualified for the position he was holding;

(3) he was discharged;

(4) other employees of similar qualifications were not discharged.

*Judge v. Marsh*, 649 F.Supp. 770, (D.C.D. C.1986); *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1983).

The Court concludes that plaintiff has met his initial burden of proof and established a prima facie case of race discrimination. A prima facie case "raises an inference of discrimination only because we presume these acts if otherwise unexplained are more likely than not based on the consideration of impermissible factors." *Furnco Construction Company v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978).

■ Once a plaintiff has met his burden of establishing a prima facie case the bur-

den shifts to the defendant to rebut the presumption of discrimination by producing evidence of some legitimate nondiscriminatory reason for discharging the plaintiff. The defendant has stated a legitimate nondiscriminatory reason for its decision to discharge plaintiff. A review of the evidence and testimony presented by defendant's witnesses supports reasoning that plaintiff was discharged for failure to follow orders. The Court is particularly persuaded by the testimony of Mr. Bush, Guardsmark Unit Manager. The Court finds the defendant's actions with regard to plaintiff well supported and documented by the testimony of Bush and the exhibits from the defendant's personnel file. Therefore, the Court is of the opinion that defendant has met its burden of articulating legitimate nondiscriminatory reasons for discharging plaintiff.

In accordance with the United States Supreme Court decision in *McDonnell Douglas Corporation v. Green, supra*, once a defendant articulates legitimate nondiscriminatory reasons for the employment decision, the plaintiff must show the reasons offered are a pretext, that is a cover-up to conceal the real reasons. See also, *Texas Department of Community Affairs v. Burdine, supra* (1981).

At this stage, "the plaintiff retains the burden of persuasion. He now must have the opportunity to demonstrate that the professed reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the Court he has been the victim of intentional discrimination. He may succeed in this either directly or indirectly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's professed explanation is unworthy of credence."

*Texas Department of Community Affairs v. Burdine, supra* at 256, 101 S.Ct. at 1095.

The Court recognizes that a security officer's job is an important and a sensitive one. Rigid rules are required in connection with this type of employment for the pro-

tection of both the employer and employee. The testimony and evidence presented herein establish that plaintiff failed to follow the rules and regulations concerning his position with defendant.

From a careful and considered review of the testimony and evidence presented the Court finds the plaintiff has failed to prove that the reason articulated by the defendant is pretextual. The complaint should therefore, be dismissed with prejudice.

A separate Judgment shall be entered contemporaneously herewith.